Incorporated et al. Argument not to exceed 15 minutes per side. Mr. Greer for the appellate. May it please the court, I'm David Greer on behalf of the appellate Kathleen McCarthy. I would like to reserve five minutes for rebuttal. At the heart's deep core of this case there are issues of abuse of power and of the demands of decency. We're here today on a more mundane subject. Today's subject is whether the record of this case demonstrates and requires that all or any of the six claims presented should be submitted for jury consideration. Typical of this case is the fact that it's a case where the judge, without seeing a live witness, made credibility determinations on a summary judgment ruling. It's the first one that I've seen where a judge made prior formal rulings that suggest that these are indeed jury issues before throwing a case out on a summary judgment. That was the most egregious error that the most egregious and probably one that goes to the heart of the case because this is a lady who probably would have given up on all the other claims if she had just been permitted to take her $37,000 severance and take care of her sick husband with health insurance. So the most egregious one is the fraudulent inducement claim. And indeed that's the one that the court in ruling on the motion for sanctions. He said specifically McCarthy has evidentiary support for her argument that she would have been eligible to receive retirement health benefits if her employment had terminated in August of 2008. Specifically she has identified evidence that she had signed the DOA, which is the... I'm sorry, you said on which day, August? August 19th. The agreement that she signed was on August 20th. And she had been previously told in various ways that she was or she wasn't. Back on the 14th of August she had been told by Mr. Zewisa that she was not going to get any health benefits. I'm sorry, can you help me here? I may have missed something. I thought that she had signed on the 14th this opportunity pool document but with some qualifications. Then there's an email where Cameron says she has to sign it with no qualifications as of the 15th. I guess I thought that was when she did. So is there a document that shows that she didn't sign until the 20th? That's my understanding here, that the document was signed and put into effect with her protest that she would not have signed had she been told that she had health benefits. Can I ask you a question about the district court's ruling on the fraudulent inducement plan? You probably don't have the order in front of you, but he says that there's no falsity about which API can be deemed knowledgeable. My understanding of the record was that there were in fact numerous occasions on which she was told by API. Even though API representatives had acknowledged that she was being told something different by the retirement specialist, my understanding was that she was told that she could not retire with health benefits. And that she was told that on more than one occasion, both prior to and subsequent to her execution of the documents that put her into this status that was, I can't remember exactly what it was called. Tell me just a little bit about your, I gather you probably don't agree with that, or I don't know, maybe you do, but do you agree with that and what's the evidence to the contrary? She was told on numerous occasions, and the depositions of Sawissa and the other managers will show it in the record. She was told on numerous occasions that she could not have health benefits if she retired because she hadn't reached the age of 65 with 10 years of seniority or the other qualifications, an earlier age with more years of seniority. She was told that on numerous occasions, and indeed the same judge that made the summary judgment ruling, in addition to the ruling that I've just read to you, also held in the entry in order he filed on a motion for a second amendment complaint filing, that she has pled an identified evidence that API made a false statement regarding her entitled post-retirement medical benefits, and that it may have known at the time that they had falsely told her that she was eligible for those benefits, and that she has pled an identified evidence regarding the remaining elements of the fraudulent inducement claim. And in another ruling, that is docket 64 in the record, in another ruling, docket 94, he again says there is rule 56 evidence on this subject, and the facts as they play out are that she, back in July when they told her about this surplus issue that was coming up, made various calls and gained an understanding that yes, she could retire, take her severance pay, take care of her sick husband, take care of the medical benefits, have the medical insurance to cover that crisis, and then she was told on August the 14th by Mr. Zewisa, no, no, you can't do that, you're not 65, you've got to wait another year. And what is the exact provenance of Zewisa's statement on the 14th, is that her testimony or is there an email or a document of any sort? I believe that he has acknowledged that in his deposition, and it's her testimony as well, and it was his understanding when he told her that, that that was the case. He was given to understand differently on August 19th, five days later, when he received an email that we didn't, despite endless requests, find for four years in this case, despite endless requests for that information. Under your scenario, I'm trying to make a reasonable claim, there'd be a fact issue for the jury about whether API had given her incorrect information through stubborn negligence or with an intent to say something that was false, or with recklessness in saying something that was false, is that right? That is correct, and there's also the link to a promissory estoppel claim that we promise you, Kathleen, that if you retire now, you're not going to get any of that information. Yeah, it doesn't fit, it doesn't fit very well in the promissory estoppel, it fits a lot better in the fraudulent indictments. Well, I agree with you, that's what I'm determined to do. Is there enough controversy or confusion about what she was being told with respect to the health benefits as opposed to, quote, service pension? That appears in some of the emails. The August 19th email, I agree with you, is absolutely clear, you are entitled to health benefits, but in previous conversations and emails, is there a confusion between whether people were talking about service pension or service benefit as opposed to health benefit? Not really, if you put it in the real world context. My worthy adversaries in their brief have made much of that kind of an argument, but it is a semantic argument when you consider that all of her conversations with the people responsible for giving her out of the ways of guidance were in the context of, I've got a very sick husband, he may die, I need to take care of him, I need medical benefits, I can't quit. She wouldn't have been considering taking the early retirement in case she not had the sick husband and needed to be off at that time, but she couldn't do that unless she had medical benefits. Absolutely, and in any conversation about retirement benefits, that was always the theme. The issue was a husband that was seriously ill, that needed medical attention and needed medical insurance. Thank you. Good morning, Your Honor. Terence Bingley on behalf of the defendant appellee with respect to the first appeal. I completely disagree, not surprisingly, with opposing counsel with respect to what this case is. This was a case in America where an employer went through a common reduction in force. The initial challenges to this reduction in force had to do with the manner in which the collective bargaining agreement provided for the layoff. When you look at this case in its totality, the only difference for plaintiff in this case is the fact that the plaintiff did not retire in 2009 before she retired with her medical benefits and before she retired with her full pension benefits. That's the only distinction. The testimony in the record is, had she retired like she claimed she wanted to in August of 2009, she would have not gotten her full service retirement pension benefits. They would have been cut because she wasn't eligible. There was this cause of action that led up to the district court. That's correct. But in the overall scheme of things, the conversation about retirement benefits was always about retirement benefits, not about... And what is your evidence that it's about, that that was her interest and that that was the context in which the conversations were being carried out? There's abundant evidence. In fact, there's no evidence that the entire conversation had anything to do with retiring medical benefits. Because number one, the plaintiff was contacting and in regular touch with what she thought was Fidelity, the pension administrator. That's who she was going back and telling Zewisa and her other people that Fidelity is telling me I can retire with benefits. When in reality, she was talking to A.I. Hewitt, but she was telling people, and her notes are replete with references, Fidelity says I can retire. These employees who work at a... And who? Are you saying there's a different administrator for health than for pension? Absolutely. And there's two different standards for eligibility. Okay, but I understand that part, but then why is the Honda email of the 19th says, Dwight, this is to Cameron, I just spoke to the Fidelity escalation team, blah, blah, blah. I'm sorry, that's the one from the 6th, I'm reading the wrong one. The 19th, I went back to the escalation team at Fidelity and Hewitt. Hewitt researched this further, so that's your key difference between the two. That's correct. And she never spoke to Hewitt. Is that your idea? She never spoke to Hewitt, and if you looked at her notes in the record, it was talk to Fidelity, spoke to Fidelity, spoke to Fidelity. Clearly, this email on the 19th provides information contrary to what had been thought earlier. Because only... But with regard to health. Right. So my question is, your adversary said she signed on the 20th, I had thought it was a But why in the world didn't Cameron or somebody convey this information to her? Because they were all operating on the assumption, based on what she was telling them, that it was a matter of retiring with benefits. That's what they said. The language of any... They said that 100% clearly health benefits are very important to people in retirement age. Absolutely. And it was a surprise, quite frankly, to all counsel involved that there was a different standard for post-retirement medical benefits than there was for retired benefits. So that's known by August 19th, isn't it? Correct. But they answered the question as to whether Fidelity was correct as to whether she could retire or not. And that's the conversation that was going on, because everybody within AT&T knew that there was a 55-20 or a 65-10 eligibility, meaning you had to be 55 in 20 years, which she didn't have, or she had to be 65 in 10, which she didn't have, which she would only get in May. So the conversation was about what she was getting from what everybody thought was Fidelity, when in fact she was being told, yes, you could retire by aeon, which nobody knew, and you would get post-employment medical benefits in August of 2019. But nowhere, nowhere in the record does anybody tell her that you cannot retire with post-employment medical benefits or retiring medical benefits. The word medical is in none of those statements. And what they do say is they say, we've learned that you cannot retire with full benefits or benefits, service pension benefits, in August of 19. And there was no statement. And in fact, when I took her deposition, she was on the same page. She said she was told, I can't or I could retire with full benefits, I can't or I could retire with full benefits. Not a mention of medical. Well, you know, she testifies to the contrary, doesn't she? No, she doesn't. But she never says any of her proof that her interest in retiring was not whether she got her full retirement benefit, you know, whether her check every month was in full amount, but she, her interest was in health insurance. That is nowhere in the record. She testifies that that's why she wanted to retire. But she doesn't testify that any of the conversations that she had with anybody had to do with medical benefits. Well, what about July 23, I'm right, this is the phone call where she and Zawisa are on the line with somebody from Fidelity, right? Right. Bill at Fidelity. And there's an email, Exhibit H, from Zawisa to Kiyama, Kathleen and I just spoke with her about full health benefits, excluding vision when she retires, and then they say she doesn't. Yes. And in reality, that wasn't. Kathleen doesn't qualify for this. In reality, that was a conversation that she was having with Fidelity, not. I understand that, but the statement, the statement is, I just spoke regarding her eligibility for full health benefits. Right. At least according to Zawisa's email. Right. They were talking about health benefits, and he says Kathleen doesn't qualify for this. That is the conversation she had with Fidelity, not. But she's talking to the wrong people, and API people are talking to her on the call too, and the understanding that your client's representative has of the call is that they were talking about health benefits. Why is that not? Well, first, it's an admission against interest on his part, showing that API didn't acknowledge that they're talking about health benefits. I mean, what happened? I mean, it just didn't seem to make it. It's a stretch in my mind to contend that there's no evidence that API was aware that at least part of the conversation was about health benefits. And the other thing is, if API knew she was talking to the wrong people, why wouldn't API have said that when they're having a conversation about health benefits, why wouldn't they have said you're talking to the wrong people? The question is whether or not API made the misrepresentation, not whether the information she received from the third-party administrator was somehow inaccurate. The claim is one for falsehood. But there's plenty of evidence in the record that API told her repeatedly that she could not retire with the health benefits. There's no evidence in the record that says that anybody at API, and the district court found this, that anybody at API told her she could not retire with medical benefits in August of 2008. The conversation was limited to retirement benefits, full benefits, retirement benefits. Are you talking about retirement in August of 2008, or are you admitting that a statement was made that you're convincing it was not made until August of 2008? I'm saying there was no evidence in the record that the plaintiff was ever told by anybody at API that she could not retire with medical benefits, retiring medical benefits in August of 2008. What does the end of August 2008 modify? I'm sorry, Your Honor. Are we talking about retirement in 2008? Yes. Or are you talking about what date? Do you contend that a statement was ever made to the effect, to the plaintiff, to the effect that she could retire but not with medical benefits? There was no statement made that she could retire without medical benefits, because she couldn't retire with full benefits until May of 2009. So the conversation was you cannot retire with benefits in August of 2008. There is nothing in the record, as the district court found, that anybody told her that you can't retire with medical benefits in August of 2008. I heard you, and maybe the sentence wasn't exactly right. You said people told her she couldn't retire with benefits. They just didn't say you can't retire with medical benefits. Right. And the reason somebody says you can't retire with any vehicles, but they didn't tell her you can't retire without this Cadillac, doesn't the former encompass the latter? No, because the specific allegation in the fraudulent inducement claim is that she was specifically told that she could not retire with retiring medical benefits in August of 2008. In the July 23 memo from Louisa, is there some evidence in that regard? No, it is not. And she never testified. In her deposition, she said all she was told was she could not retire with benefits. And the big argument was these people knew that if she was getting information from Fidelity, allegedly from Fidelity, that she could retire in August of 2008. That was not correct, because they knew the 5520, the 6510 standard. So they were saying to her, you can't retire in August of 2008. What do benefits include, though? They include a lot of other things. They included service pension. They included some life insurance. They included all kinds of things. All encompassing, which includes medical benefits. The service pension benefit eligibility did not include medical benefits. Benefits is a kind of generic term. It's a generic term, but it's also defined by what the plan is and what you're entitled to. Not everybody retires with benefits and gets medical benefits. Clearly, there was a lot of confusion. I understand that. But your only answer to why Cameron didn't do anything after getting behind the e-mail is just what? Eh, who cares? Because they were focusing on, and you can see it in his, they were focusing on her eligibility for retirement. But was Cameron ever deposed? No, he was never deposed by the plan. They didn't have this August 19th e-mail until when, 2012? Yes, that's correct. But more importantly, fraudulent inducement isn't only, as we claim, making a clear and concise statement upon which somebody relies. The idea with fraudulent inducement is that you're induced to do something. And here, the argument is she was induced to enter into the employment opportunity agreement because of that. Now, that's a fundamental element of this claim for fraudulent inducement. So not only does she have to come up with a specific representation by clear and convincing evidence, she also has to come up with the evidence that this representation was made to get her to do something. And there was never any evidence in there to suggest that, you know, API wanted to tell her all these things just to get her to continue working for another eight months. So the fundamental problem with the fraudulent inducement claim is that even if there was a statement and the district court correctly found that there was no such representation about medical benefits, until, I might add, until intelligently, when Plano filed an affidavit in response to the motion for summary judgment and then her statements in the affidavit contradicted her deposition testimony by saying that she was specifically told by people that she wouldn't be able to receive retiree medical benefits in August of 2008. When she testified in her deposition, she didn't know who made the statement to her, and then she testified that all the conversation was about medical benefits, was about retirement benefits, not medical benefits. It isn't medical benefits. I could be retiring benefits. It can be. You know, vision, dental, all can be benefits. But when the plaintiff herself said, I'm talking to the retirement people. But she herself said in one of these, doesn't she, that I understand that I wouldn't get dental or vision and life insurance. So she knew there was a subset. Correct. Correct. But retirement with benefits, the whole conversation was I'm talking to the pension administrator. They say I can retire with benefits. But in fact, she was talking to the post-employment health care people who said she could get retired. Your take on this is that the main benefit of retirement is your pension. And so therefore, when you talk about retirement with benefits, she must have been talking about the pension. But you might, you know, an average person might concede, if you're talking about retirement at all, the pension is the continuation of salary, which is your retirement status. Benefit arguably only refers to the extras, like health insurance, you know, life insurance, whatever else you've got. I don't, with all due respect, I don't necessarily agree with you. When people talk about I'm receiving pension or I'm receiving pension benefits, that usually is akin to continuing salary. But I said, you know, I'm not a lay person in this context. If I said, well, I'm going to retire, but I can keep my benefits, that would mean to me that I was going to be able to keep benefits like health insurance. Well, I understand that. But the practical reality in this case is what was she told and whether there was evidence that she was told that specific retiree medical benefits issue. Thank you. Mr. Greer, at least for my purposes, you might want to focus on or at least try to address the question of false statement for the purpose of, at least as you've indicated to me, it's pretty clear that false statements were made, whether she signed on the 14th or the 20th, which I think you proved right about that time. But what is any evidence that they did it to keep her in this job pool situation? And that doesn't help AT&T in any huge way. They should have told her about the email. But why would they be doing this to induce her to do something? Because they got a free ride for nine months. They got nine months of essentially involuntary servitude without an Academy Award combination. And if they had done the right thing in your view, the only difference here would have been that she would have gotten $20,000 or $30,000 in more cash. Is that right? Right. It's no big deal, objectively, with the size of the company. We may tackle a lot of stuff later. But at the time, the only difference was she would have $20,000 or $30,000 instead of $18,000. Yeah. And that, I think, was probably important to these little managerial people who were making these wrong decisions. She would get it up front if she retired. She'd get her cash up front. If she retired, she'd get $37,800, I think is the number. And she wouldn't have to work. And she wouldn't have to work. And if they told her the truth, her husband would have had the health benefits. She could be home taking care of the poor man. But instead, these managers sat like a prisoner in a cell marking off each time she got a check how much it diminished, that $37,800. And if you play that back, I think the question that was asked that resonated most in my mind is when they got that e-mail on August 19th, why didn't somebody say, oh, by the way, Kathleen, you can get medical benefits? Absolutely. And I always thought conflict and evidence and confusion was for juries to sort out. Was there an effort made to impose hammering? Was there a reason you didn't? I was not involved in this case in the trial scenes. Melissa was deposed. And my understanding is that he got the news on this August 19th information as well, either by telephone or by a copy of the e-mail. Yeah, he showed. And so he's the white person. When you got that, because you deposed him before you got the August 19th e-mail. It only took us four years to get it, John. When you got it, was there any ability to try to re-depose him or extend the deposition to Solisa? I wish I could answer that one, but I simply am not the guy who can do it. Right. But I think what all this plays into is that the same kind of highly technical arguments for avoiding the fraudulent inducement are the same arguments that API has presented on the ERISA penalty claim. I mean, there's no excuse conceivable to me why, whether they didn't like the 37 or whatever it is, requests for this information, and why it was stonewalled until months after a court order requiring them to produce such documentation. As this court has held, in these situations, if you send it to the lawyer for the company or somebody who's not the precise person who's supposed to get the request, the human thing to do and the proper thing to do is to relay that information or tell you who to relay it to. And that's kind of what this whole case is like. The fraudulent inducement, the ERISA claims, the keepers in voluntary servitude position in violation of the Fair Labor Standards Act. This is a case I respectfully submit that is a jury case. Thank you, counsel. That portion of the case will be submitted for recall in the next court document.